IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2011

## SARA ANN (SPENCER) WANGERIN v. SHAWN ALLEN WANGERIN

**Appeal from the Chancery Court for Montgomery County**
**No. MCCHCVDI07617      Laurence M. McMillan, Chancellor**

---

**No. M2010-00628-COA-R3-CV - Filed August 26, 2011**

---

In an action for divorce and custody, Father appeals the trial court's decision to declare Mother the primary residential parent of the parties' minor child. Because Father failed to file a transcript or statement of the evidence pertaining to a portion of the trial, we affirm the judgment of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

John E. Herbison, Nashville, Tennessee, for the appellant, Shawn Allen Wangerin.

Sara Ann (Spencer) Wangerin, Pro Se.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Sara Ann Wangerin ("Mother") filed a complaint for divorce from Shawn Allen Wangerin ("Father") in Montgomery County Chancery Court on August 28, 2007. The parties are the parents of one minor child born May 6, 2006. Mother also applied for an order of protection for herself and the child, claiming that she "suffered extreme verbal, emotional and degrading abuse." An ex parte order of protection was granted on August 24, 2007, for a period of fifteen days or until changed by the court. A hearing was scheduled for September 5, 2007.[1] Father filed an answer and counter-complaint. In an "agreed order

---

[1] Nothing in the record indicates whether that hearing took place.

amending order of protection" filed April 30, 2008, Father was allowed visitation with the child, supervised by Father's parents, for one weekend in Missouri.[2]

The parties submitted income and expense statements. In an order filed June 9, 2008, Father was ordered to pay Mother the monthly sum of $3,250 in pendente lite support. Mother was ordered to pay the monthly mortgage payment and regular monthly household bills.

Father filed a motion for contempt on June 10, 2008. He claimed that Mother violated the court's order to pay the monthly mortgage and regular monthly household bills. Father alleged that the mortgage was three months behind and all the household utilities had been cut off. On July 25, 2008, Father filed a motion to amend the court's previous order. Father claimed that Mother had abandoned the house and moved to Missouri. Father, a captain in the Army, was deployed to Iraq and requested that he be allowed to make the payments on the mortgage and household bills rather than pay Mother to do the same. On August 28, 2008, Father filed a motion for possession of the marital residence. On October 23, 2008, Father was granted exclusive possession of the marital residence until a final hearing.

In an order dated November 14, 2008, Father was ordered to pay Mother $840 per month as child support.

A guardian ad litem for the child was appointed on December 12, 2008.

On April 8, 2009, the trial court ordered visitation for Father the first weekend of May, June, and July 2009. Mother was ordered to bring the child to Clarksville for each visitation and to bear the cost of transportation. A final hearing was scheduled for October 6, 2009.

On April 13, 2009, Father moved the court to issue subpoenas for the mental health records of Mother from Blanchfield Army Community Hospital ("BACH"). A hearing was held on May 8, 2009. On July 27, 2009, the court granted Father's motion in part. The court stated that it would issue a subpoena duces tecum to BACH for Mother's medical records to be provided to the court under seal. The court stated that, upon receipt of the records, it would review them to determine whether any portion of them should be provided to Father.

---

[2] We note that the April 30, 2008 order granted Father visitation April 17-20, 2008.

A trial was held on October 6 and December 4, 2009.[3] Mother proceeded pro se.[4] At the conclusion of the October 6 hearing, the court declared the parties divorced and divided the marital property. With regard to the parties' child, the court ordered three supervised visits with Father in the presence of the guardian ad litem so that the guardian ad litem could make a recommendation to the court.

A final decree of divorce was entered on February 5, 2010. In its order, the court stated that the last of the three supervised visits ordered between Father and the child had not occurred because Mother did not transport the child to Tennessee. The court then declared Mother the primary residential parent and adopted a parenting plan. The parenting plan specifies that Mother will spend 260 days and Father 105 days with the child. Father will have the third week of each month from January through May and September through November. The parties will alternate two-week blocks for the months of June, July, and August. Father's gross monthly income was determined to be $7,000 and Mother's was $801. Consequently, Father was ordered to pay $855 per month in child support.

---

[3] The record does not contain a transcript from the December 4, 2009 proceedings. Father's appellate brief explains that no court reporter was arranged for that day's proceedings, but Father's counsel "intends to submit, shortly after submission of the instant brief, a motion to permit late-filing of [a Tenn. R. App. P. 24(d) statement of evidence from the December 4th hearing] and to direct certification and transmission of the same as a supplemental record pursuant to Rule 24(e)." The record contains no such statement of evidence.

Father filed numerous motions for extension of time to file his appellate brief. In one motion filed November 12, 2010, Father moved this court for an extension to file his appellate brief "until seven (7) days after filing with the clerk of this Court of a supplemental record consisting of a Tenn. R. App. P. 24(d) Statement of Evidence presented at the hearing of December 4, 2009 in this cause." In that motion, Father asserted that he filed a statement of evidence with the trial court clerk on November 12, 2010, and was awaiting approval of the statement by the trial judge and transmittal of a supplemental record. On November 24, 2010, this court ruled as follows on Father's motion:

> The appellant filed his notice of appeal on March 11, 2010, and the sixty (60) day time period for filing a statement of the evidence expired on May 10, 2010. Tenn. R. App. P. 24(c). The record was filed on June 23, 2010. The appellant has not requested permission to file a late statement of the evidence, and his motion contains no explanation whatsoever for the inordinate delay in filing the statement. Accordingly, we decline to grant the appellant an extension of time until after a supplemental record containing the statement of the evidence has been filed.

No such statement of the evidence is in the record, although Father was evidently subsequently granted two more extensions of time to file his brief.

[4] It appears from the record that Mother was represented by herself and, alternately, by counsel at various points leading up to trial.

Father filed this appeal on March 11, 2010.

On June 10, 2010, Father filed a petition in the Montgomery County Juvenile Court for a finding of dependency and neglect, issuance of an ex parte restraining order, and an award of emergency and permanent custody. Mother filed an answer. On June 10, 2010, the juvenile court issued a restraining order "prohibiting [Mother] from interfering with [Father's] temporary emergency custody pending a hearing."[5]

STANDARD OF REVIEW

Our review of the trial court's findings of fact is de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Marlow v. Parkinson*, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007). When the trial court makes no specific findings of fact, however, we must review the record to determine where the preponderance of the evidence lies. *Kendrick*, 90 S.W.3d at 570.

Determinations regarding custody and visitation "often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). We "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). "[A]ppellate courts will decline to disturb a parenting plan fashioned by a trial court unless that decision is based on application of an incorrect legal standard, is against logic or reasoning, or is not supported by a preponderance of the evidence." *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004).

ANALYSIS

Father appeals the trial court's designation of Mother as the primary residential parent. Mother did not file a brief in this appeal.

---

[5] On September 15, 2010, Father filed a motion for consideration of post-judgment facts in this court. The motion alleged that Mother initiated litigation in the state of Missouri regarding the parties' child in March 2010. Father sought to have the transcript of the hearing and copies of the pleadings filed in that case admitted in this court. Father also sought to have admitted the June restraining order against Mother issued by the Montgomery County Juvenile Court. This court determined that the proceedings before the Missouri court were not appropriate for consideration by this court pursuant to Tenn. R. App. P. 14. However, we determined that the proceedings before the Montgomery County Juvenile Court were appropriate for consideration by this court.

A final decree in a divorce action that involves minor children must include a permanent parenting plan. Tenn. Code Ann. § 36-6-404(a). A parenting plan is defined as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support." Tenn. Code Ann. § 36-6-402(3). A residential schedule designates the primary residential parent and sets out the time the child(ren) will reside in each parent's home. Tenn. Code Ann. § 36-6-402(5). The primary residential parent is the parent with whom the child resides more than fifty percent of the time. Tenn. Code Ann. § 36-6-402(4).

If no limiting factors outlined under Tenn. Code Ann. § 36-6-406 are dispositive of the child's residential schedule, then the court is guided by Tenn. Code Ann. § 36-4-404. In this case, there do not appear to be any limiting factors found by the trial court. Thus, we look to Tenn. Code Ann. § 36-4-404(b), which identifies the factors to be used in determining a residential schedule and designating a primary residential parent for minor children:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

The primary concern in determining residential placement is the best interests of the child. Tenn. Code Ann. § 36-6-401(a).

Father erroneously relies on the factors set forth in Tenn. Code Ann. § 36-6-106(a) in his argument rather than those listed at Tenn. Code Ann. § 36-6-404(b). *See Bryant v. Bryant*, No. M2007-02386-COA-R3-CV, 2008 WL 4254364, at \*5 (Tenn. Ct. App. Sept. 16, 2008) ("[T]he issues concerning the primary residential parent and the parenting plan are controlled by Tenn. Code Ann. § 36-6-404, not Tenn. Code Ann. § 36-6-106."). However, we note that "[t]here is little substantive difference between the factors applicable to

parenting plans, set out in Tenn. Code Ann. § 36-6-404(b), and those applicable to custody determinations, set out in Tenn. Code Ann. § 36-6-106(a), as far as determining comparative fitness and the best interests of the child." *Dillard v. Dillard*, No. M2007-00215-COA-R3-CV, 2008 WL 2229523, at *6 n.5 (Tenn. Ct. App. May 29, 2008).[6]

Father notes the trial court's lack of findings relative to any factors and asserts that the evidence in the record preponderates against the court's best interest determination. Because the trial court did not make any factual findings, we must conduct our own review of the record and determine where the preponderance of the evidence lies.

Father cites Mother's history of not allowing him to see the child. At the time of trial, Father testified that he had seen the child two times in approximately two years. Father deployed to Iraq in October 2007. Prior to his deployment, the last time he saw the child was in August 2007. He later traveled to Kansas City, Missouri, while on mid-tour leave from Iraq and saw the child for two days. At the October 2009 trial, Father stated that he had not seen or talked to the child since April 2008 and he did not know where the child was.

When asked why she had not allowed Father to have any contact with the child since April 2008, Mother replied that "the order of protection was still in standing at that time." Mother testified that, although the order of protection expired in September 2008, she and the child were placed in protective services through the state of Missouri in June 2008.[7] Mother stated that the program is "like witness protection, but it's protective services for—it's—it's protection from someone that has—in some shape or form—abused another party." Mother stated that she "would be willing to come out of protective services if [Father] is willing to meet me in the middle with what I proposed." Mother clarified that

---

[6] This court explained further in *Dillard*:

While the parenting plan legislation did not explicitly repeal the prior statutes on custody and visitation, it is clear that the legislature intended that courts (1) adopt permanent parenting plans in all divorces involving minor children; (2) not award "custody" or "visitation" in cases where a parenting plan is required; and (3) apply a specific set of factors, included in the parenting plan legislation, when approving or designing a permanent parenting plan.

*Id.* at *4 (footnote omitted).

[7] There is no evidence in the record of an order of protection against Father aside from the August 24, 2007 ex parte order pending a hearing. However, both parties acknowledge that an order of protection was issued against Father. Father testified that there was a one-year order of protection issued against him in August 2007. Father also testified that "I never physically abused her" and "it was ruled that I wasn't physically abusive."

what she wanted was reassurance that "he's not going to take off with [the child] and disappear." Mother claims that the reason she missed earlier visitations with Father was because she was not receiving mail.

Father was ordered by the court to have three supervised visits with the child in May, June, and July 2009. Mother was to transport the child to Clarksville at her own expense for the visits. Father testified that he appeared for each visit, along with an individual approved by the guardian ad litem to provide supervision. Father testified that Mother failed to appear with the child for any of these visits, and he filed a police report for each instance.

In October 2009, the trial court ordered three supervised visits between Father and the child in the presence of the guardian ad litem. In its February 5, 2010 final decree of divorce in which it named Mother the primary residential parent, the court noted that Mother failed to bring the child to the final visitation. In June 2010, Father was awarded temporary emergency custody by the juvenile court, which did not make any factual findings to explain its decision.[8]

Father also questions Mother's emotional and mental fitness to parent the child. The record is replete with Mother's mental health records. Mother participated in the Army's Exceptional Family Member Program, which Father described as a program "run by the Army for Army soldiers that have family members that have special needs." Mother has been diagnosed with schizoaffective disorder, dissociative identity disorder, residual ADHD, and multiple personality disorder. She also has a shoulder condition (adhesive capsulitis). Father testified that he had serious concerns about his son being in Mother's care, custody, and control. He described "manic episodes where she'd lock herself in the closet or the bathroom" and "rock back and forth and cry." Mother testified that she has "tendencies of dissociative disorder," "severe ADHD," and "severe dyslexia." Mother stated that, at the time of trial, she was under the care of a psychiatrist and was taking Adderall (for ADHD), Klonopin (to help her sleep), and Trazodone (to help her sleep). Mother acknowledged that Trazodone and Klonopin are antipsychotic medications.

Mother expressed her own concerns about Father's ability to parent the child. Mother testified at trial that on one occasion in August 2007, Father "went six feet across the room over a coffee table full swing directly at [the child's] head." Mother stated that the child was not struck because she "scooped him up." Mother testified that on another occasion, Father "hauled off and slapped [the child] really hard and he went spinning across the back of the

_____

[8] The decision of the juvenile court is not covered in Father's notice of appeal. Therefore, this court is not reviewing that decision.

couch." Mother testified that, about a week later, Father "threw [his shoe] very hard directly at [the child's] head," causing the child to "bobble back and forth for about two minutes."

Father also doubts Mother's ability to support the child and provide him with necessary care. Mother failed to follow the court's June 2008 order to pay the monthly mortgage and regular monthly household bills when the parties separated. Father alleges that Mother allowed the marital home to fall into a state of disrepair while he was deployed. He described the condition of the home: the floor was "down to the plywood" in one bathroom, living room, laundry room, and kitchen; the electricity and water were shut off; a toilet was outside of the home; a back window was broken; and there were three truckloads of garbage in the garage rotting. The record contains photos of the house in this condition. Father testified that, despite the court's order that Mother pay the mortgage, he made a payment of $8,195.03 on the mortgage in September 2008 while he was in Iraq to keep the home from entering foreclosure. Father testified that he also paid the first monthly mortgage payment of $1,157.33 that Mother had been ordered to pay in June 2008. The trial court granted Father exclusive possession of the home in October 2008 until a final hearing.

At the October 2009 trial, Father discussed his plan for child care should he be deemed the primary residential parent. Father also testified that he had been offered "a non-deployable for two years" and was not going to re-deploy in his job. However, that offer was pending the trial court's decision in the divorce proceeding; it is unclear whether that same offer is on the table now. At the time of trial, Mother testified that she was enrolled full-time in school at Pinnacle Career Institute in Missouri studying kinesiology "for personal training and physical therapy."

The trial court declined to make a decision in the case following the October 6, 2009 trial. The court specifically ordered that there be three subsequent visitations between Father and the child, observed by the guardian ad litem, who was to make a recommendation to the court.

Unfortunately, there is no evidence before this court about what transpired during the December 4, 2009 portion of the trial. The appellant has the primary burden to see that a proper record is prepared on appeal and filed in this Court. Tenn. R. App. P. 24. Because Father failed to file a transcript or a statement of the evidence pertaining to the December 4, 2009 trial date, our consideration of the issues he has raised must be limited to the papers filed in the trial court and the transcript from the October 6, 2009 trial date. While there is considerable evidence in the record concerning the behavior of both parties leading up to the October 2009 trial, we think it significant that the trial court declined to reach a decision regarding custody until the guardian ad litem could observe three visitations between Father and the child and offer his recommendation. Two of those visitations apparently took place,

but there is nothing in the record that reveals the guardian ad litem's recommendation. Our case law is clear that "[i]n the absence of a transcript, this Court presumes that sufficient evidence existed to support the trial court's decision." *Irvin v. City of Clarksville*, 767 S.W.2d 649, 653 (Tenn. Ct. App. 1988). Accordingly, we have no alternative other than to affirm the judgment of the trial court.

CONCLUSION

The decision of the trial court is affirmed. Costs of appeal are assessed against Father, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE